In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 01-2844, 01-2845

SIERRA CLUB and MISSOURI COALITION
FOR THE ENVIRONMENT,

*Petitioners,*

*v.*

ENVIRONMENTAL PROTECTION AGENCY
and CHRISTINE TODD WHITMAN, Administrator,

*Respondents,*

STATE OF ILLINOIS, STATE OF MISSOURI
and BI-STATE INTERVENORS,

*Intervening Respondents.*

On Petition for Review of Final Rules
of the Environmental Protection Agency.

ARGUED APRIL 15, 2002—DECIDED NOVEMBER 25, 2002

Before ROVNER, DIANE P. WOOD, and EVANS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* The Clean Air Act (CAA), 42 U.S.C. § 7401, *et seq.*, first enacted in 1970 and extensively revised in 1977 and 1990, establishes a complex and comprehensive regulatory system to reduce air pollution nationwide. The CAA requires the Environmental Protection Agency (EPA) to set national ambient air quality

standards (NAAQS) specifying the maximum permissible air concentration of pollutants such as ozone, carbon monoxide, and sulfur dioxide. The 1990 Amendments created a classification system for areas that had not yet attained the permissible NAAQS for ozone based on how far out of compliance they were. It also specified measures each nonattainment area was required to take and limited the number of years each area had to achieve compliance. In 1991, the EPA designated the St. Louis area (consisting of the city of St. Louis, four Missouri counties, and three Illinois counties) as a "moderate" area. 56 Fed. Reg. 56,694, 56,751 (Nov. 6, 1991). This meant that it had until November 15, 1996, to achieve compliance. 42 U.S.C. § 7511(a)(1). As of the time the record in this case was compiled, St. Louis had not attained the ozone NAAQS.

Such a failure, according to the text of the CAA, should result in a "bump-up" to the next classification, "serious." Although the EPA agreed in a March 18, 1999, proposed rule that St. Louis was still out of compliance, see 64 Fed. Reg. 13,384, it noted that St. Louis had made such good progress that it was otherwise only in "marginal" noncompliance. Under the CAA, however, the fact that St. Louis was not in full compliance required that its classification be upgraded to "serious," rather than being downgraded to "marginal." The EPA, however, did not take the required action; instead, it proposed that it would redesignate St. Louis as a serious area, but defer final action on its reclassification while it investigated the possibility of a deferral of the formal "attainment date."

This maneuver prompted the Sierra Club to file a lawsuit against the EPA in the district court for the District of Columbia. In response to that suit, the EPA issued a rule which extended St. Louis's attainment deadline by eight years. The case now before us is a direct petition for review of the final EPA rule. Because we find that the

EPA has no authority to create such an extension, we grant the petition for review and order the agency to redesignate St. Louis a serious nonattainment area.

## I

Under the CAA, states that have not met the NAAQS for any pollutant are required to draft State Implementation Plans (SIPs) specifying emissions limitations applicable to pollution and taking additional steps to attain the relevant NAAQS. 42 U.S.C. § 7410(a). SIPs must be designed to bring a state into compliance and also must prohibit emissions that "contribute significantly to nonattainment in, or interfere with maintenance by, any other State." *Id.* § 7410(a)(2)(D)(i)(I).

In 1990, Congress responded to the problem of widespread nonattainment of the ozone NAAQS by adding "Subpart 2," 42 U.S.C. §§ 7511-7511f, which had the purpose of imposing "carefully designed restrictions on EPA discretion." *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 484 (2001). The EPA was to classify each ozone nonattainment area as either marginal, moderate, serious, severe, or extreme based upon its 1989 air quality. 42 U.S.C. § 7511(a)(1). Each area is then required to impose specific pollution controls and must achieve the ozone NAAQS by an assigned attainment date, ranging from 1993 to 2010, depending on the area's classification. Subpart 2 further provides that in some circumstances the EPA may grant "no more than 2 one-year extensions" of an area's attainment date. *Id.* § 7511(a)(5); *American Trucking*, 531 U.S. at 493.

Within six months of an area's attainment date, the EPA must determine "whether the area attained the standard by that date." 42 U.S.C. § 7511(b)(2)(A). If the EPA determines that a marginal, moderate, or serious area did not attain the pertinent standard, it is required

to reclassify the area to the next higher classification. *Id.* The area's attainment date is then extended, but it is at the same time subjected to the additional controls applicable to the higher classification. H.R. REP. NO. 101-490, at 232 (1990).

Although much air pollution is a local problem, wind currents and other environmental factors can cause emissions from "upwind" regions to contribute extensively to pollution in "downwind" areas. Congress recognized this problem in 1990 by strengthening several provisions of the CAA. First, it required for the first time that SIPs prohibit not just emissions that pollute the state where the source is located but also those that contribute to the nonattainment of any other state. *Id.* § 7410(a)(2)(D). Second, it reaffirmed that downwind states affected by transported pollution may petition the EPA to impose limits directly on upwind sources of pollution. *Id.* §§ 7426(b)-(c).

In 1995, the EPA acknowledged that many downwind states were having difficulty making progress toward attaining the ozone NAAQS through no fault of their own, but rather because of upwind pollution. It convened an Ozone Transport Assessment Group (OTAG) to study the problem. OTAG's work culminated in the "$NO_x$ SIP Call," which required various upwind states to revise their SIPs by implementing further environmental controls. 62 Fed. Reg. 60,318, 60,319 (Nov. 7, 1997). See generally *Michigan v. EPA*, 213 F.3d 663, 672 (D.C. Cir. 2000) (describing OTAG). The $NO_x$ SIP Call gives states until May 31, 2004, to implement specific $NO_x$ controls. Since it is accepted on this record that the St. Louis area is in part burdened by transported pollution from Kentucky, the $NO_x$ SIP Call is expected to benefit it.

## II

The EPA first designated St. Louis a nonattainment area in 1978. 43 Fed. Reg. 8964 (Mar. 3, 1978). In 1991, as noted

above, it classified St. Louis as a moderate ozone non-attainment area in accordance with the 1990 Amendments, with a statutory attainment deadline of November 15, 1996. 56 Fed. Reg. 56,694, 56,786 (Nov. 6, 1991). To this day, St. Louis has failed to attain the ozone NAAQS. In 1998, the Sierra Club filed a lawsuit in which it asked the district court to order the EPA to publish a notice reclassifying St. Louis as a serious area for failing to meet its attainment date. The EPA responded by publishing a proposed notice of reclassification. 64 Fed. Reg. 13,384 (Mar. 18, 1999). Upon closer inspection, however, it was apparent that the proposed notice was delivering less than it promised, insofar as the EPA also stated in it that the agency would issue a final rule only after giving St. Louis an opportunity to qualify for an attainment date extension under its downwind extension policy (the Extension Policy). *Id.* at 13,385.

The Extension Policy is an EPA interpretation of the CAA to allow downwind areas to extend their attainment dates if they meet certain criteria. 64 Fed. Reg. 14,441 (Mar. 25, 1999). To qualify, the downwind area must show that ozone transport "significantly contributes" to the area's nonattainment and that the area has adopted local measures that will cause it to be in compliance with the standards no later than the date on which reductions are expected from upwind areas as a result of the $NO_x$ SIP Call. *Id.* at 14,442. The EPA justified its policy on essentially equitable grounds: it felt that an extension for this type of area was necessary because otherwise the area would be bumped up to a higher nonattainment classification despite the fact that pollution from upwind areas was contributing to its nonattainment. *Id.*

The Sierra Club continued to press its lawsuit. On a motion for summary judgment, the EPA conceded that it had failed to comply with the statutory mandate to publish an attainment rule for St. Louis by May 15, 1997,

but it asked that it nonetheless be permitted to defer publication of the final classification order until June 29, 2001. The delay would give the agency time to finalize a decision about St. Louis's entitlement to an extension under the Extension Policy. On January 29, 2001, the district court granted the Sierra Club summary judgment and ordered the EPA to publish notice of its final determination no later than March 20. *Sierra Club v. Browner*, 130 F. Supp. 2d 78, 95 (D.D.C. 2001).

On March 9, the EPA filed a "Motion Re: Alternative Planned Response to Comply with Court's Order of January 29, 2001." In that motion, the EPA noted that under the Administrative Procedure Act its final rules normally take effect 60 days after publication. However, it announced that with its March 19 Final Rule it would also publish a proposed rule to postpone the effective date of the nonattainment determination from May 18 until June 29. In response, the district court noted that it only had jurisdiction to compel the EPA to comply with specific statutory mandates and that the EPA would fulfill its obligations so long as it published a rule by March 20. The Sierra Club petitioned the D.C. Circuit for a writ of prohibition, which was denied on the ground that the Sierra Club had adequate, alternative remedies, namely an appeal to this court under 42 U.S.C. § 7607(b)(1). *In re Sierra Club*, No. 01-1141, 2001 WL 799956, at *1 (D.C. Cir. June 8, 2001).

The EPA then took the course of action it had outlined to the district court. On March 19, it determined that St. Louis had failed to meet its attainment date and would, as of May 18, be reclassified as a serious nonattainment area. 66 Fed. Reg. 15,578. It also proposed to set a new attainment date of November 15, 2004. That same day the EPA proposed a separate rule to extend the effective date of the St. Louis nonattainment determination from May 18 until June 29. 66 Fed. Reg. 15,591. The EPA

finalized this rule on May 16 and formally extended the effective date of the nonattainment determination to June 29. 66 Fed. Reg. 27,036. Finally, on June 26, the EPA issued a final rule finding that St. Louis qualified under the Extension Policy and extending its attainment date from November 15, 1996 to November 15, 2004. 66 Fed. Reg. 33,996. The EPA determined that in light of the significant contribution of upwind pollution from Kentucky, the attainment date extension was necessary "to give effect to Congressional intent" and "to redress the unfairness of requiring a local area to pay the costs of curing problems created by pollution transported from [other states]." *Id.* at 34,005.

The Sierra Club filed a motion in the district court to enforce its judgment and to order the EPA to withdraw the June 26 rule. The district court held that it lacked jurisdiction to take that action and that the EPA had complied with its limited order by publishing a notice before March 20. That ruling was affirmed on appeal. *Sierra Club v. Whitman*, 285 F.3d 63 (D.C. Cir. 2002). At the same time, the Sierra Club petitioned this court for review of the May 16 and June 26 rules.

### III

In a nutshell, the Sierra Club argues before this court that the EPA's Extension Policy goes beyond its authority under the statute. In assessing the Sierra Club's claim that the EPA has acted unlawfully, we are guided by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Chevron* requires us to engage in a two-step inquiry. At step one, we inquire whether Congress "has directly spoken to the precise question at issue," in which case we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If the statute is silent or ambiguous on the issue, we will

defer at step two to any reasonable agency interpretation. *Id.* at 843; *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000). In this case, the first step of the inquiry is dispositive.

Before proceeding, however, we must assure ourselves that *Chevron* provides the proper framework here. The Sierra Club says that it does not; it argues that we should instead review the EPA's rules *de novo* under the principles espoused in *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). While *Mead* did restrict the level of a court's deference to informal agency actions, *Chevron* still applies to policies expressed in an agency's final rules that have been subject to notice and comment review, as both the May 16 and June 26 rules have. *Mead*, 533 U.S. at 230; *U.S. Freightways Corp. v. CIR*, 270 F.3d 1137, 1141 (7th Cir. 2001). We are satisfied that these are formal enough expressions of agency position that these rules, at least, fall under the *Chevron* framework. The Extension Policy, however, is another matter, as we shall see.

The Sierra Club's principal challenge is that the EPA has no statutory authority to implement the Extension Policy and grant St. Louis an extension. The EPA acknowledges that the CAA's text does not grant it such authority explicitly, but it believes that its policy is supportable nonetheless in light of a "broader congressional intent not to punish downwind areas affected by ozone transport."

The most obvious problem with the EPA's approach is that Congress has already spoken to the precise question of extensions under the CAA by enacting an extension provision that looks nothing like the agency's Extension Policy. In 42 U.S.C. § 7511(a)(5), Congress granted the EPA authority to extend an area's nonattainment deadline, but only under narrow circumstances. The area must have implemented all measures required under its SIPs,

can have recorded no more than one ozone exceedance in the previous year, and can be granted "no more than 2 one-year extensions." See generally *Wall v. EPA*, 265 F.3d 426, 432 (6th Cir. 2001) (discussing application of this provision to Cincinnati). The Supreme Court has emphasized the fact that Subpart 2 of Title I of the CAA, §§ 7511 to 7511f, was designed to "eliminate[ ] regulatory discretion that [Subpart 1] allowed." *American Trucking*, 531 U.S. at 484. "Whereas the EPA has discretion under Subpart 1 to extend attainment dates for as long as 12 years, under Subpart 2 it may grant no more than 2 years' extension." *Id.* Since the CAA explicitly delegates to the EPA the authority to grant only two years' worth of extensions, we can only conclude that the agency's decision to extend St. Louis's deadline by eight years, from 1996 to 2004, is invalid. The reading of the statute the EPA has adopted, and that it defends here, "would subvert the plain meaning of the statute, making its mandatory language merely permissive," *Miller v. French*, 530 U.S. 327, 337 (2000), and contravene the general principle that a literal interpretation of deadlines and time limits is "the only proper reading of those words." *United States v. Locke*, 471 U.S. 84, 93 (1985). Furthermore, St. Louis could not hope to qualify for the limited extension available through § 7511(a)(5), because it failed timely to implement its SIP and has recorded more than one ozone exceedance every year to date. The EPA has no power to grant St. Louis an extension longer than the one authorized by the statute when it has not even met the statutory prerequisites.

Undeterred, the EPA argues that "the fact that Congress provided an extension based on air quality that is near attainment . . . does not imply that Congress intended to preclude EPA from authorizing extensions based on other considerations." It asserts that § 7511(a)(5) reflects little more than a generalized intent not to punish states

that have done all they can to achieve attainment through implementation of local controls. At this broad level of analysis, it goes on, the EPA's Extension Policy is entirely consistent with the statute; it too recognizes that some areas will be unable to achieve attainment even though they have taken all steps required by the CAA, because out-of-state pollution is being transported into the area. Had Congress been aware of the problems that would attend efforts to control transport, the EPA theorizes, it would have "expressly, rather than implicitly, authorized EPA's actions here."

The simple structure of the 1990 Amendments belies the EPA's claim. At the same time Congress enacted § 7511(a)(5), which applies to ozone nonattainment, it also heavily revised Subpart 1 of the CAA, which deals with other air pollutants. The EPA is also required to set attainment dates for nonattainment areas with respect to Subpart 1 pollutants, but it has the authority to extend those dates "for a period no greater than 10 years . . . considering the severity of nonattainment and the availability and feasibility of pollution control measures." 42 U.S.C. § 7502(a)(2)(A). This is precisely what the EPA is trying to do here; it has found that because of upwind pollution it is not feasible for St. Louis to attain the ozone NAAQS. But "it is generally assumed that Congress acts purposely when it includes particular language in one section of a statute but omits it in another." *City of Chicago v. Environmental Defense Fund*, 511 U.S. 328, 338 (1994) (citing *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993)). Since Congress left no doubt in Subpart 1 that it knew how to grant the EPA the power to issue lengthy extensions based on feasibility and practicality, we must assume that its use of different language adopting a stricter extension policy under Subpart 2 was intentional.

The statute itself reveals that the EPA's theory that Congress was unaware of transported pollution is mistaken.

In several sections of the 1990 Amendments Congress did address the problem of transport and explicitly wrote in a variety of remedies. First, Congress permitted the EPA to exempt from reclassification areas that could demonstrate that they would have attained the ozone NAAQS "but for emissions emanating from outside of the United States." 42 U.S.C. § 7509a(b). Second, the EPA may designate an area a "rural transport area" if it finds that "emissions within the area do not make a significant contribution to the ozone concentrations." *Id.* § 7511a(h)(2). In such a case, the area need only implement the control measures required of a "marginal" area, no matter how severe its ozone pollution. *Id.* § 7511a(h)(1).

These modifications to the general reclassification scheme of Subpart 2 show that Congress was well aware of the transport problem and it devised a particular solution to it. Congress's solution, however, was not as sweeping as the EPA now would like; instead it relies on exemptions and extensions only in limited circumstances. In most cases, Congress expected that transport problems could be solved by requiring SIPs to include mechanisms to stop emissions that contribute to nonattainment in other states, *id.* § 7410(a)(2)(D), and by permitting states to petition the EPA to impose controls on emissions sources in other states that are shipping pollution their way, *id.* § 7426(b). Thus, under the scheme Congress envisioned, Missouri, Illinois, and other downwind states have numerous remedies to explore if they are burdened by transport: (1) they may seek to qualify for an exemption as a rural transport area or an area affected by international pollution; (2) they may seek a two-year extension of their deadline; or (3) they may petition the EPA to impose further controls on emissions sources in upwind states.

Of course, St. Louis is not a rural area, nor is it affected by pollution from Canada or Mexico (as far as we know),

and a two-year extension at this point is unhelpful. That is why it turned to the EPA's Extension Policy. Neither Illinois nor Missouri has ever exercised its § 7426(b) powers to request a halt to Kentucky's pollution. The states point out that this provision would have done them little good since at the time St. Louis's deadline expired in 1996 the OTAG study had not yet been completed, and this study apparently provides the only evidence that Kentucky pollution affects St. Louis in any way. Still, nothing in the CAA required either the formation of OTAG, which EPA organized in 1995 in response to a recommendation from the Environmental Council of the States, or implementation of the OTAG Study. 62 Fed. Reg. 60,318, 60,323. Congress did request that the EPA study the role of ozone precursors in ozone formation, see 42 U.S.C. § 7511f, but nothing links the results of this study in any way to the bump-up provisions of § 7511(b)(2). Instead, all indications are that Congress created a comprehensive system of exceptions to its fairly rigid scheme, none of which even remotely resembles the Extension Policy. When Congress creates some exceptions to a statute, it is presumed that this list is intended to be exclusive. *Russello v. United States*, 464 U.S. 16, 23 (1983).

The EPA relies on a single case, *NRDC v. EPA*, 22 F.3d 1125, 1135-37 (D.C. Cir. 1994), for the proposition that it may extend CAA deadlines even absent explicit statutory authority, but that decision can hardly override the far more specific guidance the Supreme Court provided in *American Trucking* about this very statute. We find *NRDC* inapposite in any event. *NRDC* extended a state deadline that was specifically tied to an EPA publication deadline that the agency had failed to meet. *Id.* at 1135. However, the D.C. Circuit itself has rejected the proposition that this decision justifies the Extension Policy. *Sierra Club v. EPA*, 294 F.3d 155, 161-62 (D.C. Cir. 2002) (rejecting application of Extension Policy to Washington metro-

politan area). Like our sister circuit, we find no statutory basis for concluding that the bump-up provision was somehow tied to the EPA's ability to restrict ozone transport or that Congress did not want bump-ups to occur until the NO$_x$ SIP Call (nowhere mentioned in the statute) went into effect.

Indeed, we take issue with the EPA's most basic premise: that the CAA harbors within its structure a broad intent never to impose penalties on states burdened by transport. The initial classification scheme rigidly categorized non-rural areas based on their 1989 air quality without taking transport into account except in the limited case of an area very close to the border between classes. 42 U.S.C. § 7511(a)(4). Thus, a heavy industrial area that produced all its own pollution and a light urban area that produced relatively little pollution but that received huge amounts of pollutant blown in from that industrial area could easily both receive the same classification and have to implement the same controls, even though a more cost-effective solution might have been to put more controls in the first area and fewer in the second. Congress, however, did not want to wait around for the EPA to determine how much, if any, of an area's pollution was the result of transport and how much was home-grown. It chose a more rough-and-ready approach to classification in § 7511(a)(1). It also specified concrete deadlines and mandated that areas failing to meet those deadlines "shall be reclassified." *Id.* § 7511(b)(2)(A). Faced with such clear language, we find that Congress did not delegate to the EPA any authority to grant extensions of more than two years based on interstate transport. See *American Trucking*, 531 U.S. at 484.

In the end, the EPA's argument boils down to an assertion that because Congress granted some exemptions, it must have meant that the EPA could create additional exemptions when it genuinely believed that a particular

area, like St. Louis, deserves them. This argument falls flat—at least in a world where Congress holds the legislative power, agencies must operate within defined legal boundaries, and courts must respect the legislative will. Courts "will not presume a delegation of power based solely on the fact that there is not an express withholding of such power." *American Petroleum Inst. v. EPA*, 52 F.3d, 1113, 1120 (D.C. Cir. 1995). Many statutes on the books contain detailed statutory provisions designed to implement broad congressional objectives. When Congress enacted major welfare reforms in 1996 it specifically required states to put welfare recipients into job training programs and mandated that a certain percentage of those recipients be employed by a certain date for a state to receive federal grants. See 42 U.S.C. § 607(a)(1). Under the EPA's logic, the Department of Health and Human Services should feel free to decide that, because of current economic downturns and state budget crises, states may disregard these requirements. Or the Internal Revenue Service could on its own authority provide additional tax breaks to the poor or small businesses or even adjust tax rates on the ground that such actions will in fact stimulate more future revenue, which is what Congress really wants anyway.

No one seriously thinks that those hypothetical examples would be approved, and for the same reason, we cannot endorse the EPA's position here. It is not the EPA's prerogative to disregard statutory limitations on its discretion because it concludes that other remedies it has created out of whole cloth are better. *American Trucking*, 531 U.S. at 485; *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060-61 n.9 (D.C. Cir. 1995).

Having rejected the EPA's arguments, we turn briefly to a separate contention pressed by several intervenors. They allege that the Extension Policy is required by our decision in *Illinois State Chamber of Commerce v. EPA*, 775

F.2d 1141 (7th Cir. 1985). There we vacated an agency rule under which certain counties that were part of the Chicago metropolitan area were included in the Chicago nonattainment area. We found the inclusion of these counties inappropriate because they did not contribute significant amounts of pollution to the area, but were only affected by transport. *Id.* at 1147-50. We fail to see how this case, arising years before the 1990 CAA Amendments, reflects in any way on the present situation. Nobody quibbles with St. Louis's original designation as a moderate nonattainment area, and, as with Chicago, several Missouri counties that are part of the St. Louis metropolitan area but do not contribute to nonattainment are not included in the nonattainment area. This case is not like *Illinois State Chamber of Commerce*, because the EPA has not determined that St. Louis or any counties in the area are not significantly contributing to nonattainment. It has only found that Kentucky is contributing as well.

In sum, Congress addressed in great detail the circumstances under and extent to which the EPA could grant exceptions to the nonattainment schedule. Extensions where the failure is the result of transported ozone are not among them. It may well be, as the EPA and the states contend, that Congress has adopted a foolish and uneconomical scheme. It may turn out that the additional controls that will be required because of the reclassification of St. Louis to a serious nonattainment area will cost the region millions of dollars and yet (even if they lead to some measurable improvements in air quality) will not permit St. Louis to attain the ozone NAAQS sooner than 2004. But under our system of government, it is not our business or the EPA's business to rewrite a clear statute so that it will better reflect "common sense and the public weal." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 195 (1978). Only Congress can do

that. If the EPA wishes to provide St. Louis with any classification other than serious, it must petition Congress to change the law.

**IV**

Having found that the EPA's Extension Policy is contrary to the unambiguous text of the CAA, we need not consider the Sierra Club's other arguments for review and express no opinion upon them. The petition is GRANTED. The June 26, 2001, rule extending St. Louis's attainment date is VACATED, and the case is REMANDED for entry of a final rule that reclassifies St. Louis as a serious nonattainment area effective immediately, and any further proceedings consistent with this opinion.

A true Copy:

       Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*