RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0047p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SIERRA CLUB,

                      *Petitioner,*

    *v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; GINA MCCARTHY, Administrator of the United States Environmental Protection Agency,

                      *Respondents,*

STATE OF OHIO; OHIO UTILITY GROUP, et al.,

                      *Intervenors.*

Nos. 12-3169/3182/3420

On Petition for Review of Final Rules of the
United States Environmental Protection Agency.
No. EPA-R04-OAR-2010-0937.

Argued: October 9, 2014

Decided and Filed: March 18, 2015

Before: GIBBONS and KETHLEDGE, Circuit Judges; DOW, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Robert Ukeiley, Berea, Kentucky, for Petitioner. Amy J. Dona, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. Aaron S. Farmer, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Intervenor State of Ohio. **ON BRIEF:** Robert Ukeiley, Berea, Kentucky, David C. Bender, MCGILLIVRAY WESTERBERG & BENDER LLC, Madison, Wisconsin, for Petitioner. Amy J. Dona, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. Aaron S. Farmer, Elizabeth R. Ewing, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Intervenor State of Ohio. Louis E. Tosi, Michael E. Born, Cheri A. Budzynski, SHUMAKER, LOOP & KENDRICK, LLP, Columbus, Ohio, for Ohio Utility Intervenors.

_____

[*]The Honorable Robert M. Dow, Jr., United States District Judge for the Northern District of Illinois, sitting by designation.

1

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.   In 2011, the Environmental Protection Agency ("EPA") determined that the Cincinnati-Hamilton metropolitan area had attained national air quality standards for particulate matter, thanks in no small part to regional cap-and-trade programs that had reduced the flow of interstate pollution.  EPA also redesignated the area to "attainment" status even though the three States that administer its pollution controls had never implemented particular provisions, known as "reasonably available control measures," applicable to nonattainment areas.  Sierra Club thought the agency had acted illegally with respect to both actions, and it filed a petition for direct appellate review in this court.  The parties dispute both Sierra Club's standing to challenge the agency action and the correct interpretation of the relevant statute, the Clean Air Act.

We find that the Club has standing, and we agree with its claim that "reasonably available control measures" are a prerequisite to redesignation.  Therefore, we vacate EPA's redesignation of the Ohio and Indiana portions of the Cincinnati area.

**I.**

A.

The Clean Air Act ("CAA") authorizes EPA to promulgate National Ambient Air Quality Standards ("NAAQS") for various types of emissions deemed injurious to public health and welfare.  42 U.S.C. § 7409(a)–(b).  Once the agency has promulgated a particular NAAQS, the Governor of each State must submit a "state implementation plan" ("SIP") with particular methods for achieving the NAAQS.  *Id.* § 7410.  EPA will then designate portions of each State as "attainment areas" (that attain the standard), "nonattainment areas" (that do not), or as "unclassifiable."  *Id.* § 7407(d)(1)(B).  If an area is designated as nonattainment, the State or States containing that area must revise their SIPs to meet additional requirements located in Part D of Subchapter 1, Chapter 85 of Title 42.  *See, e.g., id.* § 7502.  One such requirement, which we will refer to as "RACM" or "RACT," is that the state SIP "provide for the implementation of

all reasonably available control measures ["RACM"] as expeditiously as practicable (including such reductions in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology ["RACT"]) and shall provide for attainment of the national primary ambient air quality standards." *Id.* § 7502(c)(1). Another such provision, termed "New Source Review" or "NSR," forces the State to set up a permit regime "for the construction and operation of new or modified major stationary sources anywhere in the nonattainment area, in accordance with section 7503 of [Title 42]." *Id.* § 7502(c)(5).

When a State asks EPA to redesignate a nonattainment area to attainment status (and thus remove these additional requirements from its SIP), the agency may do so only if five conditions are satisfied:

> (i)  the Administrator determines that the area has attained the national ambient air quality standard;
>
> (ii)  the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of [Title 42];
>
> (iii)  the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;
>
> (iv)  the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 7505a of [Title 42]; and
>
> (v)  the State containing such area has met all requirements applicable to the area under section 7410 of this title and part D of [Subchapter 1].

*Id.* § 7407(d)(3)(E).

In 1997, EPA promulgated a NAAQS concerning fine particulate matter (referred to as $PM_{2.5}$ to distinguish it from coarse particulate matter, $PM_{10}$), motivated largely by concerns of health impacts. *See* National Ambient Air Quality Standards for Particulate Matter, 62 Fed. Reg. 38,652, 38,652 (July 18, 1997).

**B.**

To combat the flow of air pollutants across state lines, EPA has also created so-called "cap-and-trade" programs. In this sort of scheme, the agency first "caps" the total emissions

allowable from a particular facility, state, or region, and then requires any source that pollutes too much either to invest in cleaner technology or to purchase emission reduction credits from other, more environmentally friendly sources (the "trade" part). Three cap-and-trade programs are pertinent to this case.

The first is the $NO_x$ SIP Call, which covered 22 States plus the District of Columbia and targeted known precursor emissions to ozone and particulate matter. *See* Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone, 63 Fed. Reg. 57,356, 57,477 (Oct. 27, 1998). EPA promulgated another cap-and-trade program with the Clean Air Interstate Rule ("CAIR") in 2005; this was also partly aimed at reducing fine particulate matter in the atmosphere. *See* Rule To Reduce Interstate Transport of Fine Particulate Matter and Ozone (Clean Air Interstate Rule); Revisions to Acid Rain Program; Revisions to the $NO_x$ SIP Call, 70 Fed. Reg. 25,162, 25,162 (May 12, 2005). After the D.C. Circuit ruled CAIR illegal, *see North Carolina v. EPA*, 531 F.3d 896, 901 (D.C. Cir. 2008) (per curiam), EPA promulgated a third program called the Cross-State Air Pollution Rule ("CSAPR"), *see* Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 Fed. Reg. 48,208, 48,208 (Aug. 8, 2011). The Supreme Court recently upheld this program. *See EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584 (2014).

## C.

In 2011, EPA issued Direct Final Rules approving requests from Ohio, Indiana, and Kentucky to redesignate each of their respective portions of the Cincinnati-Hamilton area from nonattainment to attainment status under the 1997 fine particulate matter NAAQS. *See* 76 Fed. Reg. 64,825, 64,825 (Oct. 19, 2011) [hereinafter "Direct Final Rule (Ohio/Indiana)"] (approving the redesignation requests of Ohio and Indiana); 76 Fed. Reg. 77,903, 77,903 (Dec. 15, 2011) (approving Kentucky's redesignation request). Notably, the agency determined that the local atmosphere had reached attainment status in significant part thanks to EPA's three cap-and-trade programs, which had reduced inflows of particulate matter from regional sources. *See* Direct Final Rule (Ohio/Indiana), 76 Fed. Reg. at 64,830–32. Sierra Club submitted several comments to EPA claiming that redesignation was improper.

In those comments Sierra Club made two arguments of particular relevance to this appeal. First, it contended that improvements in the area's air quality attributable to the cap-and-trade programs were not "permanent and enforcement reductions in emissions" required under 42 U.S.C. § 7407(d)(3)(E)(iii), and that the Cincinnati area could therefore not be redesignated. Second, Sierra Club argued that the existing nonattainment SIPs had never implemented RACM/RACT rules under § 7502(c)(1), and that therefore EPA could not have "fully approved the applicable implementation plan" for purposes of § 7407(d)(3)(E)(ii). EPA rejected these comments in its Final Rule and redesignated the area to attainment status. *See* 76 Fed. Reg. 80,253, 80,255–56, 80,258 (Dec. 23, 2011) [hereinafter "Final Rule (Ohio/Indiana)"]. Sierra Club then filed timely petitions asking this court to vacate the redesignation. The State of Ohio and a group of utilities operating in the Cincinnati area (the "Utilities Group") intervened in support of EPA's position.

## II.

### A.

At the outset, we must address a jurisdictional question. "Before bringing a case in federal court, a plaintiff must establish standing to do so." *Klein v. Dep't of Energy*, 753 F.3d 576, 579 (6th Cir. 2014). An organization like Sierra Club can establish standing through two routes: on behalf of its members, in what we have called "representational standing," or on its own behalf if directly injured. *Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540, 544 (6th Cir. 2004). For this case, we need address only the former. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 181 (2000). No one disputes that the second and third requirements are met here.[1] A Sierra Club member has standing to sue in her own right if she

---

[1]Sierra Club's organizational purposes are germane to air pollution regulation, s*ee* Kanfer Decl. ¶ 2 ("The Sierra Club's purposes are to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's ecosystems and resources; . . . and to use all lawful means to carry out these objectives."), and there is no reason to think that its members need to participate individually in the claim or relief requested.

can demonstrate three things: "(1) 'an injury in fact'; (2) 'a causal connection' between the alleged injury and the defendants' conduct—that 'the injury . . . [is] fairly traceable to the challenged action . . . and not the result of the independent action of some third party not before the court'; and (3) redressability—that the injury will 'likely . . . be redressed by a favorable decision.'" *Klein*, 753 F.3d at 579 (6th Cir. 2014) (alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). And "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (alteration in original) (internal quotation marks omitted). But upon a motion for summary judgment, "the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (citations and internal quotation marks omitted).

Here, we have a form of litigation not directly addressed by the Supreme Court in *Lujan* or subsequent cases: a petition for direct appellate review of final agency action. Surprisingly, more than two decades after *Lujan*, our circuit has not decided the "manner and degree of evidence" necessary to prove standing upon direct review, *id.*, so we must consider an issue of first impression. We now hold, like several of our sister circuits, that the petitioner carries a burden of production similar to that required at summary judgment.

The D.C. Circuit first took up the question of a petitioner's burden in, fittingly, *Sierra Club v. Environmental Protection Agency*. 292 F.3d 895 (D.C. Cir. 2002). The D.C. Circuit thought a direct petition more analogous to summary judgment than a motion to dismiss. *Id.* at 899. Because "a petitioner seeking review in the court of appeals does not ask the court merely to assess the sufficiency of its legal theory[,]" but instead seeks "a final judgment on the merits, based upon the application of its legal theory to facts established by evidence in the record[,]"

that party "must either identify in that record evidence sufficient to support its standing . . . [or] submit additional evidence to the court of appeals." *Id.* The D.C. Circuit also thought this requirement "the most fair and orderly" means to adjudicate standing because petitioners are often best situated to produce evidence of their injuries. *Id.* at 901. The court therefore required the petitioner to present specific facts supporting standing through citations to the administrative record or "affidavits or other evidence" attached to its opening brief, unless standing is self-evident. *Id.* at 900.

The Seventh, Eighth, and Tenth Circuits each found this reasoning persuasive. *N. Laramie Range Alliance v. FERC*, 733 F.3d 1030, 1034 (10th Cir. 2013); *Iowa League of Cities v. EPA*, 711 F.3d 844, 869–70 (8th Cir. 2013); *Citizens Against Ruining The Env't v. EPA*, 535 F.3d 670, 675 (7th Cir. 2008). We agree with the view of our sister circuits and see no reason why a petitioner should not be able to establish, by affidavit or other evidence, specific facts supporting each element of standing. And in fact Sierra Club has anticipated this burden and appended declarations to its opening brief from Nachy Kanfer, its Deputy Director for the Beyond Coal Campaign in the Midwest region, and Marilyn Wall, a Sierra Club member who lives and recreates in the Cincinnati area. *See* Kanfer Decl. ¶ 1; Wall Decl. ¶¶ 3–4. We therefore turn to the sufficiency of those declarations with respect to injury, causation, and redressability. We ultimately hold that the Club has demonstrated Article III standing.

**B.**

An injury in fact must be "concrete and particularized" to the petitioner, and also "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). The Club's petitions and opening brief claim virtually every type of injury the Supreme Court has recognized, but we need only address two. The Wall Declaration asserts aesthetic and recreational injury from "regional haze" and reduced "outdoor activities[,]" Wall Decl. ¶¶ 11, 13, and potential physical injury in the form of "respiratory symptoms" caused by increased particulate matter, *id.* ¶ 7. Each of these is a judicially cognizable form of injury.[2]

---

[2]The parties do not meaningfully dispute that additional particulate matter in the atmosphere presents a greater risk to human health and may reduce visibility. *See Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 515 (D.C. Cir. 2009) ("Studies have demonstrated that both fine and coarse PM can have negative effects on public health and welfare. For example, each is associated with increased mortality (premature death) rates and morbidity (illness) effects such as cardiovascular disease and decreased lung function. . . . [H]igh levels of fine PM in the air

*See, e.g.*, *Friends of the Earth, Inc*, 528 U.S. at 183 ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *Sierra Club v. EPA*, 762 F.3d 971, 977 (9th Cir. 2014) ("In addition, evidence of a credible threat to the plaintiff's physical well-being from airborne pollutants may establish an injury in fact.") (internal quotation marks omitted). The closer question in this case is just how the EPA's redesignation will affect the members' exposure to fine particulate matter—that is, whether the claimed injuries are sufficiently actual or imminent, even if concrete and particular.[3]   *Cf. Sierra Club v. EPA*, 774 F.3d 383, 392 (7th Cir. 2014) ("[T]he rules that apply to areas in 'attainment[]'" . . . . are less stringent than those governing areas in nonattainment, so Sierra Club's standing is tied to the likely effects that this new set of rules may have on polluters in the areas at issue.").

We first note that many courts have apparently found it so obvious that redesignation would lead to higher emissions that they did not even need to discuss the standing of environmental litigants, *see, e.g.*, *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 847–48 (5th Cir. 2003) (assuming Sierra Club's standing to force implementation of RACM/RACT), and we ourselves have done so in a challenge by the Club concerning some of these very same rules, *see Wall v. EPA*, 265 F.3d 426 (6th Cir. 2001). Yet the Clean Air Act addresses $PM_{2.5}$ pollution through a wide variety of mechanisms, some of which might not present an "actual or imminent" threat of increased exposure if relaxed after redesignation. The Kanfer Declaration primarily addresses the structure and purposes of the Club and is entirely unhelpful on this issue. And while the Wall Declaration broadly asserts that redesignation will increase fine particulate matter in the area, it does not explain precisely how. *See* Wall Decl. ¶ 12 ("I understand that areas designated nonattainment . . . must take certain steps to remedy that pollution. If an area is improperly redesignated, that results in more air pollution emitted and breathed by nonattainment area residents such as myself."). The Club's standing therefore turns on what reasonable

can impair visibility . . . ."). *See also* Clean Air Fine Particle Implementation Rule, 72 Fed. Reg. 20,586, 20,586 (Apr. 25, 2007) (codified at 40 C.F.R. pt. 51) ("The EPA established air quality standards for $PM_{2.5}$ based on evidence from numerous health studies demonstrating that serious health effects are associated with exposures to elevated levels of $PM_{2.5}$.").

[3]We note that our characterization of the petitioner's injury in this case might overlap with the causation element of standing. Under either label, our essential task is to determine how the redesignation influences the air quality of the Cincinnati area.

inferences we can draw about redesignation's impact on PM$_{2.5}$. *Cf. Klein*, 753 F.3d at 579–80 (finding standing based on reasonable inferences taken from an otherwise sparse record); *Natural Res. Def. Council v. EPA*, 542 F.3d 1235, 1248 (9th Cir. 2008) ("Where Congress has expressed the need for specific regulations relating to the environment, that expression supports an inference that there is a causal connection between the lack of those regulations and adverse environmental effects.").

Sierra Club more clearly identifies an impact on PM$_{2.5}$ emissions through the RACM/RACT requirements under § 7502(c)(1), which, again, state that SIPs for nonattainment areas "shall provide for the implementation of all reasonably available control measures . . . including such reductions from *existing sources* in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology[.]" 42 U.S.C. § 7502(c)(1) (emphasis added). Taking as true its claim that Ohio and Indiana did not have legally sufficient RACM/RACT measures for fine particulate matter at the time of redesignation, we find it highly likely that imposition of RACM/RACT would have some marginal effect on area emissions. Or at least as likely as an environmental litigant could ever hope to establish. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153 n.3 (2010) (finding an injury in fact where "deregulation . . . pose[d] a significant risk of contamination to respondents' crops"); *Sierra Club v. EPA*, 754 F.3d 995, 1001 (D.C. Cir. 2014) (noting that "[b]ecause '[e]nvironmental and health injuries often are purely probabilistic,'" petitioners must ordinarily show only a "'substantial probability'" or "'nontrivial risk'" of injury in fact); *accord Sierra Club*, 774 F.3d at 391. The RACM/RACT rules, as interpreted by the Club, would directly reduce emissions at sources already known to exist and to influence Cincinnati's air quality. Indeed, the Utilities Group suggests as much in justifying its intervention in the case. *See* Intervenor Utils. Grp. Mot. to Intervene 7 ("Implementation of RACT standards *would require additional reductions of PM$_{2.5}$,* which could again require [the group's] members to install additional pollution controls. Each of these issues would have real and substantial impacts upon [the group] and its members.") (emphasis added). Our conclusion comports with a significant number of explicit or implicit holdings by our sister circuits. *See, e.g., Sierra Club v. EPA*, 762 F.3d 971, 977–978 (9th Cir. 2014) (finding "credible, concrete, and . . . imminent" injuries to organization members from EPA's waiver of BACT rules, a stricter version of the RACM/RACT provision); *Sierra Club v.*

*EPA*, 294 F.3d 155, 162–63 (D.C. Cir. 2002) (implicitly finding standing for Sierra Club where it challenged the application of RACT rules). We therefore find it reasonable to infer actual and imminent aesthetic and physical injuries to an identified member of the Club from redesignation of the Cincinnati area.

Having found injury in fact, we can easily dispose of the redressability and causation requirements, which often run together. *See Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). We have already traced a cognizable injury from EPA's actions through the RACM/RACT provisions to the alleged injuries of the Club's members; we therefore see a clear causal connection. Since the alleged injuries flow from EPA's redesignations, and since the Club asks us to vacate these redesignations, granting the Club's petitions would redress its injuries. Thus, we conclude that Sierra Club has constitutional standing to challenge the EPA's redesignations.

### III.

A reviewing court will set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Where a petitioner challenges an agency's interpretation of a statute promulgated after notice-and-comment rulemaking, we assess the lawfulness of the interpretation under the familiar two-step *Chevron* framework. *See United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). The court will first ask if "Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter"; no other interpretations may be permitted. *Id.* at 842–43. "When conducting the inquiry required by *Chevron's* first step, [the court's] primary goal is to effectuate legislative intent using traditional tools of statutory interpretation." *Alliance for Cmty. Media v. FCC*, 529 F.3d 763, 777 (6th Cir. 2008) (internal quotation marks omitted). These traditional tools include analysis of the statutory text, the structure of the statute, and its legislative history. *See Fullenkamp v. Veneman*, 383 F.3d 478, 481–84 (6th Cir. 2004).

But "[i]f the intent of Congress on a matter of statutory meaning is ambiguous, however, the court is to proceed to 'step two' of the *Chevron* inquiry: whether the agency's interpretation is a 'permissible construction of the statute.'" *Mid-America Care Found. v. NLRB*, 148 F.3d 638, 642 (6th Cir. 1998) (quoting *Chevron*, 467 U.S. at 843). "The court need not conclude that

the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11. Rather, the court need only find that "EPA's understanding of this very complex statute is a sufficiently rational one to preclude a court from substituting its judgment from that of EPA." *Greenbaum v. EPA*, 370 F.3d 527, 534 (6th Cir. 2004) (internal quotation marks omitted).

**A.**

Sierra Club aims its first challenge at EPA's compliance with 42 U.S.C. § 7407(d)(3)(E)(iii), which bars redesignation to attainment unless "the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions[.]" More specifically, Sierra Club claims that EPA improperly included emissions reductions from cap-and-trade programs (including the $NO_x$ SIP Call, CAIR, and CSAPR) as "permanent and enforceable." The plain meaning of this phrase, in the Club's view, cannot accommodate a situation in which an individual emissions source can reduce its emissions one year but *increase* emissions in the next year through purchase of credits from other sources or from "spending" stored reduction credits from previous years.

The heart of this dispute is really where the sources that reduce their emissions must be located. Sierra Club implicitly asks this court to read § 7407(d)(3)(E)(iii) as requiring "permanent and enforceable reductions in emissions *from sources in the nonattainment area.*" Under this interpretation, EPA would need to determine that the Cincinnati area has achieved attainment status *solely* because sources within the confines of the nonattainment area have sufficiently reduced their emissions; improvements in Cincinnati air quality due to emissions reductions from anywhere else would be ignored. EPA and the Intervenors respond that the statutory text is silent on the location of the reductions and that a regional focus is necessary to address a fundamentally regional pollution problem. In other words, the States can show an improvement in Cincinnati air quality due to less inflow of particulate matter from sources outside the nonattainment area.

We think that the statutory context alone is sufficiently ambiguous for EPA to clear the first step of *Chevron*. *Cf. Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (finding a "fundamental ambiguity" from potential inferences across statutory sections). At least three times, appellate courts have vacated EPA rules that ignored explicit, area-specific mandates in assessing emission reductions under other sections of the CAA. *See Natural Res. Def. Council v. EPA*, 571 F.3d 1245, 1256 (D.C. Cir. 2009) (holding that the phrase "reductions in emission from existing sources in the area," § 7502(c)(1), excluded regional source reductions attributable to $NO_x$ SIP Call); *North Carolina v. EPA*, 531 F.3d 896, 907 (D.C. Cir. 2008) (rejecting a "regionwide approach to CAIR" where § 7410(a)(2)(D)(i) required a focus on sources "within the State"); *La. Envtl. Action Network v. EPA*, 382 F.3d 575, 585–87 (5th Cir. 2004) (holding that EPA violated the mandate of § 7511a(b)(1)(B), which requires calculation of "baseline emissions . . . from all anthropogenic sources in the area"). But, unlike the statutory sections in those cases, the plain language of § 7407(d)(3)(E)(iii) contains no explicit geographical limitation, so there is at least a plausible conclusion that Congress did not intend redesignation to hinge on reductions from sources in the nonattainment area. Sierra Club points to no other statutory provisions, legislative history, or other "traditional tools of statutory construction" that would totally foreclose EPA's reading. *Chevron*, 467 U.S. at 843 n.9. Thus, we turn to the second step of the *Chevron* analysis.

Here, EPA's interpretation seems eminently reasonable. In its direct final rule, the agency indicated that emissions from other "upwind" States significantly influence particulate matter concentrations in the Cincinnati area. *See* Final Rule (Ohio/Indiana), 76 Fed. Reg. at 80,256 (noting the "regional nature of particulate matter"); Direct Final Rule (Ohio/Indiana), 76 Fed. Reg. at 64,831–32 tbl. 4. It might well be the case that regional source reductions would be *necessary* to attainment under any scenario, but we need not examine that question in full. The existence of a regional problem is enough to conclude that EPA's regional focus on emissions reductions is "sufficiently rational" and within the statutory ambit to warrant deference to its technical expertise. *Greenbaum*, 370 F.3d at 534 (internal quotation marks omitted).

Moreover, even if EPA can count improvements in air quality attributable to reductions from extra-area sources, Sierra Club contends that these reductions are not "permanent and

enforceable." 42 U.S.C. § 7407(d)(3)(E)(iii). In its view, the plain meaning of "permanent" requires that each and every source reducing its emissions "will never increase [its] emissions" again. We, however, do not think it so obvious from this one word alone that the statute forecloses inclusion of cap-and-trade programs. For one thing, Sierra Club assumes that emissions "reductions" must be evaluated at the level of individual sources. But the statute does not explicitly state whether the net "reductions" may be calculated for a wider area (like the state or region). And for substantially the same reasons that § 7407(d)(3)(E)(iii) does not necessarily limit the inquiry to reductions in the nonattainment area, EPA can plausibly and rationally interpret the statute to allow a wider purview than individual sources. Under such an interpretation, the "cap" in each of the cap-and-trade programs would ensure that the relevant "reductions" are not foreseeably reversed, at least at the level of the entire cap-and-trade region. *See* Final Rule (Ohio/Indiana), 76 Fed. Reg. at 80,255 (discussing the "strict emission ceiling in each state" under CSAPR, which, cumulatively, create a regional ceiling). With a sufficiently broad level of analysis, then, EPA would simply meet Sierra Club's interpretation of "permanent." In other words, since we do not believe EPA must be limited to reductions within the nonattainment area, the agency can reasonably stretch the geographic scope to guarantee "permanence."

And we cannot say that this interpretation of "permanent" is impermissible. Sierra Club asserts that anything other than an interpretation forbidding even temporary upticks in emissions could, in the aggregate, completely undermine the NAAQS, but it overlooks that § 7407(d)(3)(E)(i) independently requires attainment of the standard as a condition of redesignation. Furthermore, the threat of future designations of nonattainment (perhaps under future particulate matter NAAQS) helps to mitigate any runaway increases in emissions after this initial redesignation. *See* 42 U.S.C. § 7407(d)(1)(B). Attainment status aside, the net benefits of forbidding *any* source to *ever* increase emissions post-redesignation, a patently harsh standard, is a policy judgment best left to the agency. *See Chevron*, 467 U.S. at 865.

This leaves Sierra Club with only one remaining argument: that reductions attributable to cap-and-trade programs are not "enforceable." 42 U.S.C. § 7407(d)(3)(E)(iii). Congress did not directly define "enforceable" in the Clean Air Act. *See id.* § 7602. Nor does Sierra Club attempt

to provide a fully inclusive definition of the term. Instead, it proffers other uses of the term "enforceable" as evidence that Congress did not think cap-and-trade programs create enforceable reductions. As noted earlier, § 7410(a)(2)(A) requires SIPs to "include *enforceable* emission limitations and *other control measures*, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights) . . . ." (emphasis added). Sierra Club argues that Congress set "enforceable emission limitations" apart from "other control measures" (including tradeable permits) because the latter were not "enforceable." But it seems at least as plausible that "other control measures" shares some meaning with the earlier phrase. At the very least, this possible inference from § 7410(a)(2)(A) leaves some doubt that Congress meant to exclude cap-and-trade reductions by inserting the word "enforceable." Nor is there any reason to think an interpretation of reductions attributable to regional cap-and-trade schemes as "enforceable" any less rational than considering such reductions as "permanent."

Ultimately, then, EPA has permissibly interpreted § 7407(d)(3)(E)(iii) to allow for a showing of "improvement in air quality" at least partially due to regional cap-and-trade schemes.

**B.**

Sierra Club next challenges EPA's approval of the States' respective SIPs without RACM/RACT provisions specifically tailored towards fine particulate matter. Here, Sierra Club alleges non-compliance with 42 U.S.C. § 7407(d)(3)(E)(ii), which prevents redesignation unless "the Administrator has fully approved the applicable implementation plan for the area under section 7410(k)." Subsection (3) of § 7410(k), titled "Full and partial approval and disapproval[,]" provides that a plan is approved "as a whole" (*i.e.*, fully), if it meets all "applicable requirements" of Chapter 85, Title 42. *See Latino Issues Forum v. EPA*, 558 F.3d 936, 938 (9th Cir. 2009). One such requirement comes from the general RACM/RACT provision, which states that all SIPs for nonattainment areas "shall provide for the implementation of all reasonably available control measures [RACM] as expeditiously as practicable (including such reductions in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology [RACT]) . . . ." 42 U.S.C. § 7502(c)(1). In approving the redesignation requests of Ohio and

Indiana despite their lack of RACM/RACT,[4] EPA interpreted this provision to mandate these measures only if needed to attain the air quality standard for $PM_{2.5}$. *See* Final Rule (Ohio/Indiana), 76 Fed. Reg. at 80,258 ("[A] determination that an area that has attained the PM 2.5 standard suspends the requirements to submit RACT and RACM requirements."). Sierra Club responds that the text of § 7502(c)(1) cannot support this interpretation.

We have already addressed, and accepted, a similar challenge by the Club in *Wall v. EPA*, 265 F.3d 426 (2001). There, EPA granted requests from Kentucky and Ohio to redesignate the Cincinnati area to attainment status under the ozone NAAQS, despite the fact that the States' SIPs had not fully adopted ozone-specific RACT measures as required under a distinct, but similar, part of the statute, 42 U.S.C. § 7511a(b)(2). *See id.* at 433–34. We vacated the redesignations, holding that the agency received no *Chevron* deference because "the statutory language regarding the implementation of RACT rules is not ambiguous. . . . By this language, it is clear that Congress intended for SIPs submitted in redesignation requests to include provisions to require the implementation of RACT measures." *Id.* at 440 (internal quotation marks omitted). And we held thus even though EPA had interpreted the ozone RACT provision as operative only if "needed to bring about the attainment of the [air quality] standard in Cincinnati." *Id.* at 433 (internal quotation marks omitted).

Sierra Club leans heavily on this court's opinion in *Wall* for the proposition that the phrase "shall provide" in § 7502(c)(1) unambiguously means that RACM and RACT provisions "must be contained be contained in SIPs submitted with respect to redesignation requests" under the $PM_{2.5}$ NAAQS. We agree with the Club, despite the fact that *Wall* interpreted RACT requirements for ozone nonattainment areas, *see* 42 U.S.C. § 7511a(b)(2) ("The State shall submit a revision to the applicable implementation plan to include provisions to require the implementation of reasonably available control technology *under section 7502(c)(1) of this title . . . .*") (emphasis added), because the statutory language at issue in that case is functionally identical to—and directly references—§ 7502(c)(1). We therefore reject EPA's attempt to

---

[4]Like those of Ohio and Indiana, Kentucky's redesignation request did not contain provisions for the implementation of RACM/RACT for fine particulate matter. But as Sierra Club candidly acknowledges, the petitioner has waived any objection to redesignation of the Kentucky area because it failed to comment on this oversight during the rulemaking process. *See, e.g., Natural Res. Def. Council v. Thomas*, 805 F.2d 410, 427 (D.C. Cir. 1986) (citing 42 U.S.C. § 7607(d)(7)(B)).

distinguish *Wall* on the grounds that that case is confined to the particulars of the ozone provisions. *See* Final Rule (Ohio/Indiana), 76 Fed. Reg. at 80,258 ("The *Wall* decision addressed entirely different statutory provisions for ozone RACT under CAA Part D subpart 2, which do not apply or pertain to the subpart 1 RACT requirements for [$PM_{2.5}$].").

EPA raises two final arguments that we also find unconvincing. Relying mostly on a decision from the Seventh Circuit, *Sierra Club v. EPA*, 375 F.3d 537, 540 (7th Cir. 2004), the agency contends that we are looking at the wrong "implementation plan." In its view (and that of the Seventh Circuit), the phrase "applicable implementation plan" in § 7407(d)(3)(E)(ii) could conceivably refer to something other than the pre-attainment SIP; perhaps the "applicable" modifier "implies that there may be differences between the contents of the pre-attainment plan and those required for the post-attainment period." *Id.* at 541. As a consequence, EPA arguably needs only to "fully approve" those parts of the SIP that "proved to be necessary to achieve compliance" with the NAAQS, not all statutory provisions imposed on nonattainment areas. *Id.* at 540–41. Similarly, EPA claims that it need only approve a SIP to the extent that the plan satisfies all of the Act's "applicable requirements" (presumably as used in § 7410(k)(3)); the agency considers statutory requirements for nonattainment areas, including RACM/RACT, as "applicable" only if they were necessary to attain the $PM_{2.5}$ standard. *See* Direct Final Rule (Ohio/Indiana), 76 Fed. Reg. at 64,828.

But *Wall* forecloses either of these readings. Again, we held in that case that the Act unambiguously requires RACT in the area's SIP as a prerequisite to redesignation—despite use of the phrase "applicable implementation plan" in the ozone RACT provision. *See Wall*, 265 F.3d at 440. Clearly, we did not read this phrase as an implicit delegation to the EPA to require ozone RACT only if necessary to attainment, and we do not now read that phrase in § 7407(d)(3)(E)(ii) as a similar delegation with respect to the general RACM/RACT provisions for all types of emissions. So we must respectfully disagree with the Seventh Circuit that "applicable implementation plan" is sufficiently vague to trigger *Chevron* deference.

As to the phrase "applicable requirements," we did note in *Wall* that this could be read to "limit[] the number of actual requirements within [§ 7410] and Part D that apply to a given area." 265 F.3d at 439. But EPA cannot rely on that language to avoid implementation of RACT

provisions because we limited any ambiguity in that phrase to provisions *not* "linked to the nonattainment status of an area." *Id.* at 438–39. The *Wall* court quite clearly thought the ozone RACT provisions to be "linked" to nonattainment status; this explains its declaration that the Act *unambiguously* requires that ozone RACT rules be included in a redesignation request—without any qualification regarding their necessity to attainment or other condition. 265 F.3d at 440. And *Wall* reached this conclusion based solely on the text of the ozone RACT provision itself, which, like § 7502(c)(1), says that a State "'shall'" include RACT in the area's SIP. *See id.* (quoting 42 U.S.C. § 7511a(b)(2)); *see also BCCA Appeal Grp.*, 355 F.3d at 847 ("*All* nonattainment area SIPs must provide for implementation of 'all reasonably available control measures as expeditiously as practicable.' 42 U.S.C. § 7502(c)(1).") (emphasis added). We apparently took this mandatory language to preclude any conceivable inferences from other statutory sections, even those that use the phrase "applicable requirements," that RACT could be implemented at the agency's discretion. So too here we give the same construction to the general RACM/RACT provisions.

In sum, a State seeking redesignation "shall provide for the implementation" of RACM/RACT, even if those measures are not strictly necessary to demonstrate attainment with the PM$_{2.5}$ NAAQS. *See* 42 U.S.C. § 7502(c)(1). If the State has not done so, EPA cannot "fully approve[]" the area's SIP, and redesignation to attainment status is improper. *See id.* § 7407(d)(3)(E)(ii). Because the Ohio and Indiana SIPs for their respective portions of the Cincinnati-Hamilton area did not provide for RACM/RACT,[5] the EPA acted in violation of the Clean Air Act when it approved those redesignation requests.

---

[5]Intervenor Utilities Group argues that Ohio's SIP in fact includes RACT for PM$_{2.5}$ because it has general RACT provisions covering all types of emissions. This is not, however, the interpretation advocated by EPA as the justification for its rulemaking on redesignation. Recall that EPA took the position when approving redesignation that RACT requirements as a category only apply if needed to reach attainment. *See* Final Rule (Ohio/Indiana), 76 Fed. Reg. at 80,255 ("[N]o RACT is required because the areas is attaining the standard."); *see id.* at 80,258 ("[A] determination that an area has attained the PM$_{2.5}$ standard suspends the requirements to submit RACT and RACM requirements."). And because EPA has not attempted, through procedures carrying the force of law, to identify *individual* control measures that qualify as RACM/RACT, we need not fully address the Utilities Group's argument. It may be the case that we will defer, as our sister circuits have done, to a view that individual measures are not RACM/RACT if they do not meaningfully advance the date of attainment, *see Sierra Club v. EPA*, 314 F.3d 735, 743–45 (5th Cir. 2002); *Sierra Club v. EPA*, 294 F.3d at 162–63, but we leave that question for another day. We hold only that EPA cannot categorically exclude the Ohio and Indiana regions from the mandates of § 7502(c)(1). *Cf. Sierra Club*, 294 F.3d at 163.

**IV.**

The petitions are granted in part and denied in part. We vacate the redesignations of the Ohio and Indiana portions of the Cincinnati-Hamilton area but leave the redesignation of the Kentucky portion undisturbed.